Our first case this morning is 2016-56, Lyons v. City of Alexandria. Mr. Pershing. Mr. Pershing, whenever you're ready, please. Good morning, Your Honor. May it please the Court. The City of Alexandria gave two inconsistent, even contradictory explanations for delaying Mr. Lyons' promotion in this case. The first one, the one that was voiced at the time, was a supposed doubt about his qualifications, given that he had to take the written test for the paramedic position a half a dozen times until he passed it. He did pass, of course, but Mr. Schultz said in an email of October 11th, while the delay was going on, that he was going to, by my direction, he was going to delay, he was going to hold up Mr. Lyons' assignment to an internship until people who qualified after him were placed. That doesn't fit the facts, of course, because it's hard to imagine that Mr. Lyons' qualifications, which did not change, would suddenly evaporate and disappear, the objection that Mr. Schultz professed in that October 11th email. That's on Joint Appendix 336, by the way. He said he would consider Mr. Lyons only after certain other later qualified candidates had been placed. The second explanation for the delay arose only during the litigation, and it says, oh, and we didn't actually delay or hold up Mr. Lyons' application to be a paramedic, to have an internship at all. We didn't hold that up deliberately. In fact, it was sort of a logistical happenstance. It was an accident arising out of a practice we had to assign people to internships on a first-come, first-served basis by shift, as it were, a kind of numbered place requirement for internships that you could get only when an opportunity arose on your shift. That, too, doesn't fit the facts. Let me ask you, Mr. Pershing, was there any challenge raised to the validity or the relevance of this test? We didn't agree. Was there any challenge raised to the test itself? We did not below. Of course, I came in only on appeal, but the court is, of course, aware, as your Honor's question reveals it, the court is aware of the sordid history of these tests and the possibility that they are racially disparate in impact at a minimum. At a very general level, that could be true. I'm talking about this test in particular. Was there any challenge? I didn't see that there was any challenge raised to this test. That's right, your Honor. Our client did not object to the test itself. He took the test as many times as he needed to in order to pass it. He became as qualified as anybody else. The administrators of the test did not say your qualifications are diminished every time you take the test until you pass. And if he had failed it a sixth time, he would simply have had to take the course again. It's not as if it was some kind of lifetime. If there was no challenge raised to the test and if it's undisputed that he failed the examination five times, that's not helpful to your case, is it? It's not helpful, but it's not hurtful because the qualification remained the same and the doubt that Schultz said he harbored in that email would not have been erased within a few months if it had any weight. That, it seems to me, is an inference totally open to the jury about that explanation for the delay. His qualifications didn't change, and so how could it be if the doubt had any merit or was really of any weight? If the test is relevant and he failed it five times, is there any comparison with any other person that failed it five times? I don't think there was. I think he had to work very hard to pass that written test, and he did so. He even paid for a remedial course out of his pocket. But I don't think it matters because as he came in to the pool of eligibles for the internship, his qualifications then remained the same until he was assigned one, and yet the claiming this doubt as a reason to intentionally hold him up, that seems... But many law firms would pay for an individual to take the test once, and some particularly generous law firms would pay for an individual to take the test twice. And a lot of law firms, if you fail the test the first time and certainly fail it the second time, would say goodbye. And so the analogy may not be perfect, but it surely is relevant. I don't disagree. Hold on just a second, and I appreciate it. If it's true that the city paid for each attempt here, and that they continue to support him through all of these failures, and as I understand it, according to remedial training, to assist him in passing, it seemed to me that they were being pretty supportive to assist, to stay behind him through all these failures to assist him in passing. How is that kind of... How is that discriminatory? I don't disagree, Your Honor, that the record shows us that Lyons tried more than anybody else we've got record of to pass that test and did finally pass the test. And I totally recognize the court's point that it doesn't show discrimination in and of itself that they allowed him to keep taking the test. I should point out that he did pay... But wouldn't that show a supportive outlook for this plaintiff? Eventually, he did pass the test, and they stuck with him, and then he did eventually get his paramedic internship. So, I mean, is this a question of no good deed goes unpunished? No, I don't think so. I'll try to explain why I agree that the giving of the chance to retake the test in and of itself does not show us that there was a discriminatory animus underlying the holdup that resulted after that. It does not appear to me that Schultz, the paramedic who didn't like that it had taken Lyons several tries to pass the test, it's not apparent from the record, and I don't think the jury is required to conclude that, therefore, there was no discrimination. Can you tell us what is the purpose of the test in the first instance? Well, it's one of the qualifications, Your Honor. It is a nationally administered test, NREMT-P for paramedic, the National Registry of Emergency Medical Tests. What is the qualification to take the test? What qualifies an individual? In other words, could the city say, I'm not going to pay after the second time? I think so, and my understanding of our record is that Mr. Lyons paid for a remedial course that he was paid for test-taking fees later. So from that perspective, the city chose to pay, and at the end of it, once one is certified, is there anything to indicate that the number of times you took it would be a qualifying difference as to whether you will be able to move to the next level sooner or later? Is there any indication that those who do particularly well or those who are more qualified or appear to be more qualified, at least in terms of basic abilities, would get priority over those who were perhaps less qualified? A perfect question, Your Honor. The answer is no. Once you pass the test, you're on the same footing under any policy or practice that I've seen as everybody else who's passed the test and the administrators of the test. Counsel, why doesn't the email that you quoted suggest to the contrary? That's an email that says, listen, because it took the guy five times to pass, we're going to put him at the back of the line. I'm not sure if that's a good idea, a bad idea, but it doesn't seem an unreasonable line to draw to say, if it takes you five times to pass, we're going to put you at the back of the line. Well, Your Honor, I don't disagree that it might be plausible as a reason to doubt the qualifications of someone. I don't disagree with Judge Wilkinson's idea about the bar exam, but the problem is that the explanation's changed. Joltz's doubt, as the court pointed out in that October email, was superseded. But I want to follow up there in terms of the email. Was there any indication of this before it was approached to him? In other words, that's a fair determination that you can say, if you take it multiple times, you're going to lose priority. But was there any indication of that before this instance at all? And then upon obtaining the priority, it seems as though if you take a test five times, you may take the bar, and maybe there are those who are different on it. You take it and pass it the first time, it indicates a high degree of proficiency. But the fact of the matter, if you do something over and over, let's say four or five times the bar, you would think that person probably has a pretty good knowledge of the law because he's done it a lot of times. But the idea here is that the ultimate purpose of the test is it is a foundational prerequisite before you can go to the next level. And except for that email, there's no indication that you are going to not get priority. It's sort of like taking the bar. Once you pass the bar, other than maybe the law firms make a difference, but in terms of being a lawyer, the state certifies you just like the guy who took it 20 times or one time, and you took it five times. So you are the same lawyer as the next one. So it may differ from job to job insofar as a law firm, but just like here, if he wanted to get certified by someone else or some other entity, they may say, well, we're not going to do it. You took it five times, but here you are within a situation where it is like the bar. Once you take the bar, you are made a, once you pass it, no matter how many times you made a lawyer, that's the bottom line. The idea is not to get a job. Getting a job is another thing. You have made a lawyer. That's the promotion you get is now your lawyer, just like everybody else. And nobody goes around wearing a sweat or anything that says I didn't pass the bar for five times or that kind of thing doesn't come up. So that's the, and even though that seems to be the issue here, their rationale, what seems to be more interesting in this case is, does it in fact trigger a Title VII situation? In other words, that delay between the time that he actually gets this, passed this test, and then that delay, does that, is that an act under the Title VII that should qualify to take an action? Thank you, Judge. I think the answer to that is, of course it does, because there was a monetary consequence. There was a pay loss that Mr. Lyons will never be able to recoup. The question whether there was adverse action,  I think is not something that needs to attend the court in this case. It's a fascinating question. That's why Amicus United States is here today, and I'd be happy to address it after they have said their piece. Can you address just briefly before your time is up, we spent a lot of time talking about the qualification piece, but what struck me is the hardest fear case is not that, but is the organization by shift. And the lack of evidence you put on to challenge that. Can you talk to me about why I should look past the by shift organizational system? Yes, Your Honor. The answer is that it doesn't fit the facts. It turns out the record will tell us that at least one of Lyons' shift mates was leapfrogged over him for an internship that he qualified for earlier. I understand that argument and I'm not going to debate it with you, but I understand that argument. Is that the only argument you've got on this issue? Well, it raises the question whether the explanation was pretextual and even the shift of explanation. But that issue is the shift mate. What I want to make sure is that I'm not missing an argument that I couldn't sort of pull out of your brief. I understand the shift mate point, but is there another argument or is that argument the sum and substance of the by shift issue? Your Honor, I see I have about four seconds. Shall I answer? Please. The city claims that even that leapfrog by Kilner is a product of a kind of logistical happenstance because by the time that the Kilner opening arose, Mr. Lyons had already applied to transfer off that shift, but they didn't even tell him that the opening had arisen until after Kilner filled it. So when Mr. Lyons wanted shift A, they tried to accommodate him there. That request was granted. My difficulty is that you're taking an employer who's accommodating at various steps along the way, particularly with taking the test repeatedly, paying for the test, and then when it comes to the shifts, they tried to continue the accommodative attitude in saying you want the shift A. The request is granted. I don't know what the shifts have to do with. I suspect it's hours, but it seems to me that it's perfectly plausible that you would have more training officers for one shift than you would for another shift. People have preferences. The point was that he wanted shift A. Once again, the employer is accommodating and granted him shift A. Your Honor, with respect, I think it's a little bit like the taming of the shrew. No, we will not make our noble Kate have— I'm sorry, but can we give up some rebuttal time? Can we hold off and hear your own rebuttal? Of course, Your Honor. Okay. Thank you. All right. Courtroom deputy, who's up next? Ms. Ethol. All right. I'll set the time in. Okay. Please proceed. Good morning. The district court's ruling was correct for three reasons. Mr. Lyons failed to state the required elements of a discipline treatment claim. He failed to adduce any evidence in the record to establish that his race played any factor in any of the decisions that the city made. And he also failed to meet his burden of establishing pretexts. The district court ruled correctly that he failed to establish a The record is very clear that there were reasons for the fact that the city made the decisions that it did. With regard to the three comparators that Mr. Lyons identified, the three white comparators, Mr. Konzel was on a different shift than Mr. Lyons. Mr. Kilner, there are clear non-discriminatory reasons why he was placed in an internship before Mr. Lyons. And the same is true for Ms. Renner. And there's also another key fact in the record that Mr. Lyons took on with regard to the comparators. As you all well know, in the Fourth Circuit, it's very clear that Mr. Lyons has to show that these individuals are similarly situated in all respects. Mr. Lyons does not focus on one particular individual, and that is an African-American comparator. And that is Mr. Alexander Lee. And that is, you can find this in the joint appendix at 104 and 89. But Mr. Alexander Lee shows unequivocally in the record that the city did not take race into consideration with regard to the internship program. Mr. Lee passed the exam after Mr. Lyons. He was placed in the internship program before Mr. Lyons on January 23, 2018. So this actually belies any claim that Mr. Lyons has asserted that the city's treatment of him was racially motivated. And Mr. Lyons does not address this issue at all in any of his papers. So the district court opinion indicating that Mr. Lyons had not adduced any evidence that his race was a factor is clearly correct in this regard. In addition to that, there's no... presented by the plaintiff that it was a first-come, first-served basis. And given that evidence, why is that not an issue of fact on that? Well, yes, Your Honor, a couple points on that. With regard to the first-come, first-served basis, it's not inconsistent with the defendant's testimony regarding the shifts. And then also, Mr. Lyons, when he argues the first-come, first-served basis argument, he's relying on Lisa Simba for that testimony. And it's undisputed in the record that Lisa Simba was not a decision-maker with regard to the internship program. So that is not an admission that can be used against the city. And Mr. Lyons himself admitted that Ms. Simba is not the one who made the decision with regard to this program. One thing that... Excuse me, Judge Richardson, go ahead. Would it matter, counsel, if it wasn't hearsay? Okay, so Ms. Simba's statement, obviously the plaintiff didn't appear to call Ms. Simba as a witness. And so the only thing we have for Ms. Simba, obviously, is hearsay. And so it can't prove the truth of the matter that's asserted. And so does that make a difference for you in evaluating Ms. Simba's testimony? Ms. Simba's alleged statement? Correct. It's our position that it is hearsay. And therefore, it's not admissible. And in addition to that, we don't believe it's inconsistent with the testimony in the record. There's no indication that it's inconsistent with our position that it's shift-based. For example, when Mr. Lyons switched to the A-shift, the testimony in the record, is that he was placed first on that shift. So being first-come, first-served on a shift is not inconsistent with the testimony in the record. I mean, what I'm saying, what I'm thinking is if first-come, first-served, that begs the question of who is the first-come. And the first-come can be the person who's qualified by passing the test. And so I'm just not saying that a first-come, first-served policy is inconsistent with the idea that the first-come is the first person who is qualified by passing the test. That's one question I had. And the other one was I'm not sure exactly how the claims went about proving that there was some sort of first-come, first-served policy because there's certainly no written policy to that effect. And it was never proposed or cross-examined. Chief Andrews or Mr. Schultz on this supposed first-come, first-served policy. But apart from not being able to show a first-come, first-served policy, let's suppose there is a first-come, first-served policy. Well, the first-come, logically enough, would be the first person who is certified by having passed the test. So there just seem to be multiple different causes here with what's being alleged. And one other point I want to raise here is that when we say first-come, first-served policy, and this is the point you're raising, Your Honor, because there was no deposition, and when Mr. Lyons asserts that there's this first-come, first-served policy, we have no context because there was no deposition on this issue. Of course, the whole purpose of summary judgment is to determine whether there's an issue of fact. And, you know, my friend Judge Wilkerson does pose a reasonable interpretation of it, but that's not conclusive and will not be the ultimate determiner of fact here. And if he puts forth evidence or the testimony that from the first-come, first-served meant, and even his own statements that that meant that those who were qualified or those who passed the test would go first. And even if you pass the test one time, the question is someone who took five times had already passed it before you passed it. That's the question. You know, I don't think it's the situation of someone passed it once, the first, and then sometimes much later, after five tries, he passes it. That's not the situation here, I don't think. Correct me if I'm wrong. But I think what it is is that he had, it took him five times, but then there were those who then took it one time or two times afterwards who got priority in doing it. And if that's the issue, then he is saying that first-come, first-served means, you know, he passed before the others did it for the one time. Is that right? Your Honor, it is correct that it took him five times to pass the test, and he is claiming that others who passed the test after him did get into the program before he did. But you have to remember, Your Honor, because of the timing of when he finally passed the test, there were other people who were ahead of him because it did take him so long to pass the test. So they were already further off in the process. Is that the issue here? Is he complaining about the ones who were ahead of him, who passed it before he did, or those who passed it after he did? I think he's complaining about both. But I think the three we're talking about now are the ones. Well, address the ones who passed it after he did, because that would seem to be one in which, you know, that first-come, first-served would seem to claim. For those who passed it after he did, even though it took them five times, were there individuals who actually got priority in terms of being able to move to the next level? When you say priority, I would not use the word priority. These are individuals who ---- Well, I don't want to get into the semantics of it. I simply want to just ask the question. Those who came after him, is that the complaint here for that group that came after him? That's the complaint, as I understand here. And there were those who came after him who were then given the opportunity to move to the internship program. Is that correct? That is correct. And those are the ones that, because of their shifts and other reasons, that they were placed in the internship program. And that's also the individual, Alexander Lee, who's also African-American, who was placed before Mr. Lyons. Now, I know we're going to hear from the government on it. And it sounds like the defendant, or at least the plaintiff, you know, I thought he should have addressed it directly. And that is a question of the adverse action here, which is, I guess, more of a legal question in terms of, would such a delay for an internship program that is a, sounds like to me it is a prerequisite before one can be promoted, is that an ultimate employment-type decision, cognizant under Title VII? Not under the law in this circuit, Your Honor. In this circuit, it has to be a significant detrimental effect. And I take the position that it's not under the law in this circuit. In which case are you relying primarily on for that? Primarily, James versus Booz Allen, Your Honor. And then also, there are a couple other cases as well. But primarily, James versus Booz Allen. Are there, I mean, I'm not certain that we reached this question. But if we reached the question, what is the best example you've got, not of the principle that it's a significant detrimental effect, but instead that the reduction in pay, or the losing out on the increased pay, doesn't qualify as a significant detrimental effect? I mean, I understand the argument. And I think the delay by itself might not be sufficient. But there was also a reduction in pay as a result, or a failure to get an increase in pay. I'm not trying to make a judgment about the phrasing there. But why wouldn't that qualify as a significant detrimental effect, even with that standard? And I believe here, it's a question of sort of where do you draw the line? He did eventually, of course, get the position. But just sort of another example, let's take a law firm example. Let's say you have a group of law firm summer associates. You have a group that starts in June. You have another group of summer associates that starts in July. You know, there's a one-month delay there between the group of summer associates. But as long as they're both going to work for the same 10 weeks, that wouldn't be a reduction in pay, right? Because it's a finite time period. It's a little bit different in the context where you say somebody's going to get a pay increase at a certain time, and we're going to delay that by three months. That pay increase is perpetual, right? The summer associate is for a set period of time. What we're talking about is a permanent increase in pay that he forewent for a month or two months or two days. I don't know, whatever the delay ultimately ended up being. The example I was going to give is I was going to say, actually, that the one group of summer associates is going to actually have a shorter period of time. The group that was starting later was going to be a shorter summer associate program. Well, you know, we've walked into this business on the bar exam and lawyers. This is not the same situation. I mean, not at all. I mean, of a summer associate as opposed to someone who has been working in the fire department, and then you have certain prerequisites that allow them to advance, and one of them is taking a test. He passes the test. You get hung up on how many times he took it, but he passed it. And that seems to be the prerequisite, not the number of times. It doesn't seem to affect it at all until his e-mail pops up. And then once he passes it, the question then becomes, is it an adverse situation, you know, to delay him and allow others who passed it after him to move to the next level? I mean, we can talk about law firms and interns all we want, but we're not going to get anything out of that because there are just too many differences of law firms. There's all kinds of things. I have law clerks and things, and they take different rules. But we're talking about a situation that if it fits within the context of Title VII, the question here is whether this is, under Title VII, an ultimate employment-type action here for which you can find an adverse discriminatory action. Do you disagree? I think on this record the court did not actually have to reach that decision. It did not have to determine whether or not it was an adverse employment action. I understand that. I understand that if you proceed in that way, and I agree with Judge Richardson that, yeah, if you make up your mind on the other things, you don't have to get there. But for someone perhaps in my position, I'm asking the question that if you do get there, and it may well be that the court will decide you don't have to get there. I'm not quite there. I think this issue is squarely before the court and is a very focal point of this case. And our position would be that the denial here of the promotion or the delay, excuse me, of him getting this position was not a final decision. I think for an adverse employment action, you need to have a final decision. He did eventually get the position. Well, let's suppose, counsel, let's suppose we just assume arguendo. I know you're not conceding the point. I think you have a good argument. But let's just say we assume arguendo that there was an adverse action here. My basic question on the merits is where is the discriminatory animus? I mean, you can be dissatisfied with the place in line or whatever. But where is the discriminatory animus? Because as I point out, the evidence in the record that I read was that they were rooting for this individual. They were cheering him on. They were giving him, they were paying him to take the test over and over. They, I think, gave some assistance with respect to it. They wanted him to succeed. They didn't want him to fail. And when he wanted a certain shift, they granted his request for the shift. So how does the fire department get hung with the program of being a discriminatory entity? And all along, it seems to me that they're on the side of this individual. They want him to succeed. And they did indeed give him the paramedic internship that he sought. I mean, it's like sometimes you, if this entity is discriminating, then it seems to me you can find discrimination almost as a matter of course. And I thought when I read this record, they want this individual to become a good contributing member of the paramedic division of this fire department. They want it to work out. And yet here they are being hauled up as harboring discriminatory animus. And that's just the ultimate, the adverse action point for one side. I certainly understand your argument on that. But I just thought on the merits, they were on the side of the plaintiff. And they thought he could be a good contributor. And they wanted him to be a good contributor. And they gave him the internship that he sought. This is not a bad actor. Do you agree with that? Do you agree with what Judge Wilkerson just said? I do, Your Honor. In other words, your statement is that the fact that the city supported him in doing this, there cannot be discrimination if in fact there's evidence that they supported him, but they supported white workers more so. You think Judge Wilkerson's scenario fits as a matter of law that just by supporting him, they cannot be discriminatory insofar as allowing others who are in a similarly situated position to be promoted on the basis of race. Is that your statement? Well, Your Honor, I don't agree that that's what Judge Wilkerson said. Okay. Well, wait a minute. Hold on. I want to backtrack that because I'm there. I heard that. And I heard it said that the fact that the city supported him, wants him to be promoted, shows no racial animus. Is that correct? What he said is that the fact that they supported him. Let's not be argumentative. Let me make sure. Do you agree with that statement? That fact alone shows there's no racial animus. That is not what I said. But then Judge Wilkerson, I would ask, would you restate it? I do not want to misstate what you said, but it sounds to me very much that is what you said. But if you did not say it, in fact, I would like a clarification. What I am saying is that the supportive attitude that the department took for the application resulting in backing him at every step of the way, helping him with the request, helping him with the test. I'm just saying that in the summary judgment calculus, that ought to weigh in terms of not finding an issue with tribal facts. I was not announcing any per se rule. I was talking about the facts in the summary judgment record. And I stand by what I said, that the facts here and the supportive attitude that was taken for the application here. Should weigh in the summary judgment calculus as to whether there is an issue of tribal facts. And I think it's a good thing in my judgment to help, to support employers who are in turn supportive of African American workers. And I think that's a good thing and it's something you want to encourage. And that's what I think the record indicates. Well, Judge, I accept what you're saying. And in that light, that's a different type of statement than to say that because they support him so even vigorously with all this, there's no racial animus. I just disagree with that. I agree it can be some evidence or maybe a factor to consider as to whether summary judgment. But when you're looking as to whether there's disputed information, if there is evidence that yes, they supported him. But on the other hand, they did so in a manner that discriminated against him because they promoted or advanced others who were in a position who happened to be of a different race. And it did so on the basis of race. But Judge, I would like to finish if it's okay. And the reason I want to finish because I think that's a very critical point. And I do not want to leave this discussion feeling different. And I'm glad you clarified where you went with that. But my point being and what I think the clarification is, is that doesn't really solve this case. The fact that they supported him because there is more here that is at least being alleged and evidence put forth here. And with that additional evidence, that's a consideration. But it is not determinative. You can support black workers as much as you want. You can go up and hold up signs that say, I'm all for black people. And then at the same time, do something completely discriminatory or to deny them promotion opportunities. That does not deny them entitled self-enactment, at least in my point of view. And I think you are agreeing with me on that point, except that you may not think that the second part is there. That is that he's shown that there is something else there discriminatory. Well, all I'm saying is that I was speaking to the facts of the case and the facts in the summary judgment record. And I was simply making a statement that I thought that the actions here of the individual defendant was supported. And that that should weigh in its favor in the summary judgment calculus. All right. Let's hear who is up next here. Ms. Baldwin. Ms. Baldwin, we'd be happy to hear from you. Thank you, Judge Wilkinson. And may it please the court. Anna Baldwin for the United States is amicus. The court has had a lot of discussion about, you know, the first ground on which the court granted summary judgment this morning about the genuine issue of material factors to whether the delay was based on race. As the courts aware, our amicus brief is just on the legal standard for the second ground on which the court granted summary judgment, saying that there was, in this case, no adverse employment action. And that holding is clearly wrong. And to see how it's clearly wrong, imagine that if the factual record in this case had been there were clear, direct evidence where you had a decision maker saying, Mr. Lyons, we are not going to give you this internship assignment and the accompanying pay raise that it comes with for the next five months because of your race. We're going to promote all of the white workers first. Right. If there were clear evidence of discrimination, clearly the separate element as to whether there's an adverse employment action, which is just a shorthand for does the discrimination regard the plaintiff's terms, conditions and privileges of employment. Clearly, that is at the heartland of the kind of claim that should be actionable under Title VII. So, you know, there's been some discussion here, again, about the fact that this involves compensation. So, I mean, that makes the question even more clear. But the United States involvement and, you know, we're glad to be able to address the court this morning is to focus on. The significant detrimental effect requirement that this court has required for a number of years in terms of showing adverse actions and to encourage the court to turn back to the plain language of the statute and analyzing whether, in fact, there's been an adverse employment action and whether there is an actionable Title VII claim. So, you know, under the plain language... Do we even need to reach this question? We can assume there's an adverse action and then proceed to the merits. Certainly the court, you know, could resolve the question in that way. I would encourage, and the United States would encourage, more importantly, the court to reach this question and address it, because this is a case where you see the way in which the significant detrimental effect is effectively having a poisoning effect on the case law, where, you know, actions, it's allowing courts to sort of... Can I ask the question, Ms. Baldwin, because I didn't exactly understand this as fully, but it seems like to me you're telling us we need to overrule our prior precedent. You're saying we need to turn... The language I think you used was turn away from the significant detrimental effects test and go back to the text of the statute, and that might be a totally legitimate argument, but you understand that we're a panel, right? Absolutely, Your Honor. I understand that this court sits as a panel, and I know that this court, you know, it's the United States position, and it's in the briefs that we've attached in Forges that we've told the Supreme Court that we think the Fourth Circuit's significant detrimental effects standard is wrong and misreads the Supreme Court's decision in Ellerth. I know that this panel can't reach those questions, but what this panel could do is nonetheless decide the claim and whether there's an adverse employment action first by analyzing, does the discrimination that's alleged regard the terms, conditions, and privileges of employment? That doesn't conflict with any prior precedent, and just as an example of this, the Sixth Circuit recently... But wouldn't that exact... I mean, listen, I totally understand your argument that suggests that the significant detrimental effects is not the right standard, right? But that's the standard we have to apply, isn't it? I mean, I understand you want to get away from that, and I understand why you want to get away from it, but I don't understand how I can do that as a member of this panel. I mean, I have not just one, but multiple prior panel decisions saying that that question, the statutory question you're asking, asks whether there's a significant detrimental effect. Sure. Your Honor, that's the Circuit's test. The United States could imagine an opinion that analyzes in the first instance, does it regard the terms, conditions, and privileges, and then sort of explains, and also it does meet the significant detrimental effect. So the United States is asking us to ignore our prior precedent, but then just sort of pay lip service to it at the end. No, Your Honor. It seems like an odd position for the United States to be taking that this panel should do something that is forbidden by our precedent, which is to overrule our prior decision. I understand. Maybe you want to say take it en banc. Maybe that's one story, but it's just odd for me for you to keep telling us to ignore our prior decision in the context that we've got. Your Honor, as an example of a way I think a panel has threaded the needle, and I certainly don't mean to be telling the Court to ignore your prior precedent, and it certainly is the case the United States would support in an appropriate case en banc hearing, but the Sixth Circuit has similar precedent about having to show a materiality impact. And Judge Sutton, in the threat versus city of Cleveland case, recently analyzed sort of by a first instance returning to the text of the statute and then explaining the way that the sort of adverse employment action doctrine had gotten away from that and still paid service to the fact that he was writing as a single judge and that the Sixth Circuit had precedent on this case, but that case involved the city of Cleveland had a policy that you couldn't have a shift of all black captains who served together, and the question was, well, are shift assignments, is that a materially adverse impact? And so the Court said, look, clearly a shift assignment, and it's a racially discriminatory shift assignment. We're going to analyze that in the first instance as to terms, conditions, and privileges. So I would just point the court, you know, that is the kind of decision where the court could make an impact in this law, the law where the Sixth Circuit has done similarly. But the point here is I think it's important for the court to begin to give some kind of guidance, even sitting as a panel to the lower courts, because whether this was an adverse employment action, it's not a difficult question. Imagining that there was a clear, you know, showing on discrimination, of course. Even if we were going to take the test, so significant detrimental effect, you might be able to fit what happened here as a significant detrimental effect. In other words, I know you want to swing for the fences, but you don't have to go that far. You could just say, look, if you're deprived of pay or whatever, that's a significant detrimental effect. But the point is, you just seem to be asking us to reach the thing that we don't need to decide. And at any rate, unless someone else has further questions, I think your time has expired. Thank you, Judge Wilkinson. All right. If anybody else has any further questions, I'm happy to let the DA know. All right. Mr. Pershing, I think you're up and I think you have some additional time. Thank you, Your Honor. First of all, the point the court was debating a few minutes ago about the ultimate discrimination question, that is a question for the jury. I think our precedence in this circuit settled the point. Prima facie case plus some evidence underlying the explanations that were given past summary judgment. That's Dennis versus Columbia Colleton. That's Merritt versus Old Dominion Freight, a case that the opinion was authored by Judge Wilkinson. In that case, you had shifting explanations. You had one explanation that arose after the litigation began. And you had some evidence undermining both explanations, including the very fact that they shifted. And that is our law in this circuit. It says if you've got that, if you've got shifting and inconsistent explanations, which we certainly have here, that passes summary judgment. The court can't simply cherry pick and set some elements of a factual dispute equal to zero and then pretend there is no dispute. So I think that's first of all. Secondly, I don't remember if I mentioned this, but the shift of origins. I don't think there's a shift in explanations. There's simply alternative explanations. And you said you did this for multiple reasons. First, if there's a first come, first served policy, that has to be that the first come is the person who first passes the test. Second of all, there was a business about the number of available people on each shift. And you say there's shifting explanations, but that's really different from alternative explanations, which may hold water in its own right. Indeed, Your Honor, and they may be multiple plausible explanations, but the court below is not supposed to cherry pick them and decide them. That's for the jury to do. That's what our cases say. I don't dispute that there are plausible reasons why some of this might have happened. No, but the Sematex decision indicates that plainly, the plaintiff bears the burden of establishing from the second judgment record an issue of pliable fact. Right. And on the Sematex, that is your burden in addition to the ultimate burden of proving the discriminatory elements. Right, and that's a trial burden. But the key thing is that our cases say, here's how you pass summary judgment. You raise a fact issue showing that the prima facie elements are present and that the explanations are undermined. The legitimate non-discriminatory reasons are undermined and that they shifted is also probative of pretext. I don't think the court can get around that below. Why wouldn't you undermine them by deposing or cross-examining Mr. Andrews or Mr. Schultz? And that could have happened. But in this case, we have a fact issue without that because Captain Simla has an email. Wouldn't taking that deposition be the quickest way to undermine it? It might, but we have ways to undermine it without that deposition having been taken. You know, you're saying that the city presented these shifting explanations and yet the people who would be in possession of those explanations were never deposed or cross-examined during the course of the deposition. Their testimony as to the explanation would have been the most relevant. They were never deposed and you do have an obligation to create them through a tribal fact. Right, and I think a tribal fact issue is present regardless of whether these people were also deposed. Let me explain. Captain Simla has an email where she says this is first come, first served. The city wants to raise a sort of invisible ink argument saying that she must have meant first come, first served by shift. We know that that is not the case because of Ryan Kilmer being leapfrogged over, a shift being leapfrogged over. The explanation is undermined. As soon as you show an undermining, you create a fact issue that the court can't simply preach or admit. That's our argument. You can't simply cherry pick the facts. The other thing is on adverse action, its innocuousness is not the same as its adverseness. And I think the court below may have run into that trap. But I would say that here the plain monetary loss gets us beyond any dispute about whether the action was adverse. The question is whether the logistical accident of first come, first served by shift that they claim or the darker explanation obtains. And that's a jury question. But let's remember that at the time that Ryan Kilmer was put into that slot there, that internship slot, that Lyons was never told until after the opportunity disappeared that he could have it. The city knew perfectly well how devoted he was to getting that internship. They didn't want him knowing somebody else had been put there. They didn't want him asking about it. Your Honor, my time is up, but there's plenty more to. Thank you very much. If any of my colleagues has questions, we'd be delighted to wait. Judge Wynn, do you have any more questions? I can't hear you. No further questions. Thank you. I'd like to thank all of you for your arguments. We unfortunately can't come down and greet you and shake your hands, but that doesn't mean we're any less appreciative. So thank the three of you so very much.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Julius N. Richardson